IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Craig S. Jones, et al.,

    Plaintiffs,

v.                                          Case No. 2:11-cv-380

Kerry A. Allen, Plan                        JUDGE MICHAEL H. WATSON
Administrator, et al.,                      Magistrate Judge Kemp

    Defendants.

<u>REPORT AND RECOMMENDATION</u>

Plaintiffs are five individuals who were employed by Red Mortgage Capital, Inc., Red Capital Markets, Inc., Red Capital Advisors, LLC, or Red Capital Community Development Company, LLC, (collectively "Red Capital"). Plaintiffs filed this action against Red Capital, certain severance plans, a plan administrator, and a company that acquired Red Capital, alleging that those Defendants wrongly denied them benefits and otherwise infringed on their rights under ERISA and their contractual rights. Before the Court are several pending motions. This report and recommendation addresses Plaintiffs' motion for partial summary judgment (Docket No. 53), which has been fully briefed. The motion for partial summary judgment argues that certain of the claims for benefits should be deemed approved under the terms of the plan(s) at issue. This motion has been referred to the Magistrate Judge for a Report and Recommendation.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 53) be denied.

## I. Facts

The facts in this paragraph, provided as general background, are undisputed. Red Capital engages in mortgage and investment banking activities. In 2004, National City Corporation

("National City") acquired Red Capital.  On December 31, 2008,
Defendant the PNC Financial Services Group, Inc. ("PNC") acquired
National City, and assumed responsibility for the administration
of certain benefit plans.  In May of 2010, certain of the
business operations and assets of Red Capital were acquired by an
investment group led by ORIX USA Corp. ("ORIX").  Plaintiffs were
all senior executives at Red Capital from at least 2003 until
some point in 2010.  Plaintiffs sought severance benefits from
Defendants, and Defendants denied their requests and appeals.
Plaintiffs filed this action asserting that they were entitled to
severance benefits pursuant to several plans and that Defendants'
denial of benefits, among other actions, violated ERISA.

One such plan is the National City Corporation Amended and
Restated Management Severance Plan ("National City Plan").  This
plan covered certain executives of National City and its
subsidiaries, including Red Capital, and it provided for the
award of severance benefits if National City incurred a "Change
in Control." (Docket No. 51, Exhs. 1 & 2 at §§ 1.2 & 2.1(d).)
The plan also provided for a "Protection Period" during which the
plan could not be "amended, modified or discontinued." (Id. at
§15.)  The Protection Period began on the "Effective Date," which
was defined as follows: "In the event a Change in Control
ultimately results from discussions or negotiations involving the
Corporation or any of its officers or directors, the 'Effective
Date' of such Change in Control shall be the date uninterrupted
discussions or negotiations commenced." (Id. at §2.1(i) & (u).)
The Protection Period continued "through to the fifteenth month
anniversary of the Implementation Date." (Id. at §2.1(m) & (u).)
The National City Plan also provides that it is to be
administered by the Committee and grants "full power and
authority to interpret, construe and administer this Plan and its
interpretations and construction hereof," and provides that

2

actions made by the Committee in accordance with the plan shall be "binding and conclusive on all persons for all purposes." (Id. at §14.) However, the National City Plan also provides that claims for severance benefits may be deemed approved if a determination is not made within the following time constraints:

> If a notice of denial is not received by a Participant within the lesser of (a) 120 days of the Committee's receipt of the claim or (b) within 30 days of the Committee's or its designee(s)'s making its determination with respect to the Participant's claim, the claim shall be deemed to have been approved.

(Id. at § 5.2.) One version of the National City Plan was effective January 1, 2005. That is the version on the National City Plan upon which Plaintiffs seek summary judgment as to Count VII of the Complaint.

One of the disputes between the parties is whether the September 30, 2008 amendment to the National City Plan was effective. In the discussion materials for a presentation by Goldman, Sachs & Co. to National City dated September 29, 2008, there is a page entitled "Potential Strategic Partners," which lists PNC as one of eight potential partners. (Docket No. 51, Exh. 18D.) The next day, September 30, 2008, was the date that the 2008 amendment to the 2005 National City Plan purportedly took effect. The 2008 amendment eliminated several circumstances under which severance benefits could be awarded under section 3.2. According to Defendants, the Effective Date was three days after the amendment, on October 3, 2008. Defendants base this date on an email that was sent from one PNC employee to another in 2010 as a part of the investigation into Plaintiffs' claims; the email stated that PNC was "first notified that another process was going to take place regarding NCC on October 3, 2008 and we signed a confidentiality agreement on October 5, 2008 to enter the process." (Docket No. 51, Exh. 36.) According to a

3

PNC news release cited by Plaintiffs (which Defendants argue is not part of the administrative record) as of October 24, 2008, PNC and National City had announced that they had signed a definitive agreement for PNC to acquire National City. (Docket 53, Exh. 19.)  PNC ultimately acquired National City on December 31, 2008.

Plaintiffs have also asserted claims in this litigation pursuant to the Red Capital Group Management Severance Plan ("Red Capital Plan").  Like the National City Plan, the Red Capital Plan provided severance benefits to certain Red Capital executives upon a "Change in Control." (Docket No. 51, Exh. 3 at §§ 1.2 & 2.1(d).)  The plan also provided for a "Protection Period" during which the plan could not be "amended, modified or discontinued." (<u>Id</u>. at §15.)  The Protection Period began on the "Effective Date," which was defined as follows: "In the event a Change in Control ultimately results from discussions or negotiations involving RED, the 'Effective Date' of such Change in Control shall be the date uninterrupted discussions or negotiations commenced." (<u>Id</u>. at §2.1(i) & (s).)  The Protection Period continued "through to the fifteenth month anniversary of the Implementation Date." (<u>Id</u>. at §2.1(m) & (s).)  The Red Capital Plan also provides that it is to be administered by the Plan Administrator and grants "full power and authority to interpret, construe and administer this Plan and its interpretations and construction hereof," and provides that actions made by the Committee in accordance with the plan shall be "binding and conclusive on all persons for all purposes." (<u>Id</u>. at §14.)  However, the Red Capital Plan also provides that claims for severance benefits may be deemed approved if a determination is not made within the following time constraints:

> If a notice of denial is not received by a Participant within the lesser of (a) 120 days of the Plan Administrator's receipt of the claim or (b) within 30

days of the Plan Administrator's or its designee(s)'s making its determination with respect to the Participant's claim, the claim shall be deemed to have been approved.

(Id. at § 5.2.)

By February and March of 2010, PNC was in active discussions about selling Red Capital.  On March 15 and 16, 2010, each of the Plaintiffs sent a letter to representatives of Defendants PNC and Red Capital Group, which, according to the letters, were intended to serve as notice of a change in circumstances and of an intent to pursue severance benefits.  On March 30 and 31 of 2010, Plaintiffs notified Defendants of their conditional resignations.[1]

On March 31, 2010, Defendant Kerry Allen, as Plan Administrator, sent each Plaintiff a memo with the subject line "RE: Claims Submitted Under The Red Capital Group Management Severance Plan (Effective July 1, 2008), The National City Corporation Amended And Restated Management Severance Plan (Effective September 30, 2008), and/or The National City Corporation Amended And Restated Management Severance Plan (Effective January 1, 2005)."  (Docket No. 51, Exh. 9.)  In this memo, the Plan Administrator acknowledged Plaintiffs' belief that they may have severance claims, reported that PNC disagreed with Plaintiffs' belief and stated, "PNC further contends that, if you resign your employment, you will not be entitled to and will not be paid any severance or displacement benefits."  (Id.)  The memo stated, "If you believe PNC's position is incorrect, you are entitled to file a claim under those plans with the Plan Administrator and/or the relevant plan Committee."  (Id.)

---

[1] The parties do not dispute that Plaintiffs continued to come to work after the "conditional" resignations, and Plaintiffs knew that PNC believed those "conditional" resignations to be ineffective.

However, the memo went on to state, "The Plan Administrator and the respective plan Committee will treat your previous submission as a 'claim' under the plans you designated, unless you notify me that you wish to withdraw one or more of those claims." (Id.) The Plan Administrator provided "official 'Claims Forms'" with the memo, the purpose of which was "to facilitate the claim process" and to "enable the Plan Administrator and the respective plan Committee to fully consider your claim based upon all of the facts and circumstances." (Id.) The Plan Administrator provided a deadline for filling out the Claim Form(s) and supporting documentation and explained that if the deadline were not met, "a determination under the plans will be made based on the information you previously submitted." (Id.) The Plan Administrator then went on to note that "The Plan Administrator and the respective plan Committee have 90 days from the date of your claim to review it, and 30 days after making a determination to respond to you in writing." (Id.)

Neither party asserts that any of the Plaintiffs withdrew any claims referred to in the March 31, 2010 memo.

On April 16, 2010, PNC issued a notice that it was discontinuing and terminating the Red Capital Plan. (Docket No. 51, Exh. 37.) Also in April, each Plaintiff submitted Official Claim Forms. (Docket No. 51, Exhs. 15-29.)

In May of 2010, certain of the business operations and assets of Red Capital were acquired by an investment group led by ORIX USA Corp. ("ORIX"). On May 25, 2010, Plaintiff Russi emailed John Johnson, Chief Legal Counsel for Employment at PNC, telling Mr. Johnson that he believed severance benefits should have been paid to him under the Red Capital Plan based on the sale of certain assets of Red Capital to ORIX. (Pls.' Mot. Summ. J., Exh. 15.) Mr. Johnson replied to that email on May 26, 2010, stating that "it is PNC's position that you are not eligible for

6

benefits under the RED Capital Group Management Severance Plan (Effective July 1, 2008).  If you believe an additional claim needs to be filed, I believe you know the process by which you may do so." (Id.)  Plaintiff Russi replied the same day requesting information about the structure of the transaction selling assets of Red Capital to ORIX, and then emailed again the following day stating that he assumed PNC did not intend to provide him factual information regarding the sale or the basis for denying severance benefits, but rather required him to file a claim and await the Plan Administrator's decision. (Id.)  Mr. Johnson replied to those emails on June 3, 2010 and explained that, among other reasons, PNC believed Plaintiff Russi was not eligible for benefits under the Red Capital Plan because (1) there was no Change in Control as defined by the Red Capital Plan, (2) Plaintiff Russi had not been terminated as of the date he filed his first claim, and (3) on the date of Plaintiff Russi's termination from employment, the Red Capital Plan was no longer in existence. (Pls.' Mot. Summ. J., Exh. 16.)  He ends his email by writing, "If you believe you have a valid claim under the plan that you have not already filed, however, I encourage you to follow the process established by the plan to resolve disputes thereunder.  If you need new [sic] claim form, you can obtain one from Kerry Allen." (Id.)

On June 16 and 24 of 2010 respectively, Plaintiffs Russi and Jones initiated a second set of claims for severance benefits under the Red Capital Plan based on the sale of certain business operations and assets of Red Capital Group to ORIX.  (Docket No. 51, Exhs. 33 & 30.)

On August 18, 2010, the Plan Administrator notified each Plaintiff that the Committee had denied all of their claims based on the acquisition of National City Corporation by PNC.  (Docket No. 51, Exhs. 38-42.)

On October 14, 2010, Plaintiffs filed notices appealing the Plan Administrator's August 18, 2010 decision denying their claims.  (Docket No. 59, Exh. T.)  On November 8, 2010, Plaintiffs Martin and Ziegler filed notices appealing the Plan Administrator's denial of their claims based on the Red-ORIX transaction.  (Id.)

On December 7, 2010, Plaintiffs Russi and Jones, having received no response to their second claims, notified Defendants of their belief that Defendants' failure to respond within 120 days caused those claims to be deemed approved pursuant to section 5.2 of the Red Capital Plan.  (Docket No. 51, Exh. 48.) On December 17, 2010, Defendants responded to Plaintiffs Jones and Russi, denying their second claims and explaining that Defendants did not believe those claims were good faith claims that required a response.  (Docket No. 51, Exhs. 43, 46.)  The reasons given for not treating the claims as good faith claims were the following: (1) Defendants contended that the Red Capital Plan ceased to exist as of April 16, 2010, and (2) Defendants contended that Plaintiffs Russi and Jones had not severed their employment with PNC at the time the claim forms were submitted. (Id.)  Defendants also explained additional reasons why they believed the claim to be without merit.  (Id.)

## II. Summary Judgment Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law.  Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962).  The moving party bears the burden of demonstrating that no material facts are in dispute.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 90

8

S.Ct. 1598 (1970).  That burden "may be discharged by
'showing'-that is, pointing out to the district court-that there
is an absence of evidence to support the nonmoving party's case."
Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548,
2554 (1986).  The evidence submitted must be viewed in the light
most favorable to the nonmoving party.  Adickes, 398 U.S. 144, 90
S.Ct. 1598 (1970).  Additionally, the Court must draw all
reasonable inferences from that evidence in favor of the
nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654
(1962).  The nonmoving party does have the burden, however, after
completion of sufficient discovery, to submit evidence in support
of any material element of a claim or defense on which that party
would bear the burden of proof at trial, even if the moving party
has not submitted evidence to negate the existence of that
material fact. See Celotex Corp., 477 U.S. 317 (1986); Anderson
v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of course, since "a
party seeking summary judgment . . . bears the initial
responsibility of informing the district court of the basis for
its motion, and identifying those portions of [the record] which
it believes demonstrate the absence of a genuine issue of
material fact," Celotex, 477 U.S. at 323, the responding party is
only required to respond to those issues clearly identified by
the moving party as being subject to the motion.  It is with
these standards in mind that the instant motion must be decided.

### III.  Analysis

Plaintiffs' motion for partial summary judgment seeks
judgment on Count VII and Count XI of their Complaint.  Both
counts rely on language in the plans stating that a claim will be
deemed approved if it is not denied within a certain amount of
time.  Count VII alleges that the Committee improperly denied
benefits to Plaintiffs because their March 2010 claims had
already been deemed approved under the terms of the 2005 National

9

City Plan by the Committee's failure to deny the claims within the specified time frame.  That count seeks benefits pursuant to the 2005 version of the National City Plan.  Count XI alleges that the Plan Administrator improperly denied benefits to Plaintiffs Russi and Jones because their claims had already been deemed approved under the terms of the Red Capital Plan by the Plan Administrator's failure to deny those claims within the specified time frame.  That count specifies that it is referring to the claims submitted by Plaintiffs Russi and Jones with respect the Red-ORIX transaction.

> **A.  Whether the First Set of Claims Should Be Deemed Approved Under the 2005 Version of the National City Plan**

The Supreme Court's decision in <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), held that ERISA decisions should be reviewed under a <u>de novo</u> standard of review unless the benefit plan gives the administrator discretionary authority to determine eligibility of benefits or to construe the terms of the plan.  In accordance with <u>Firestone</u>, the Ninth, Tenth and Third Circuit Court of Appeals have applied a <u>de novo</u> standard of review to claims that are denied or approved automatically after a certain number of days has passed.  <u>See, e.g., Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan</u>, 349 F.3d 1098, 1106 (9th Cir. 2003) (considering a claim that was deemed denied based on time limits in the relevant plan as well as ERISA regulations, and holding that "[d]eemed denials are not exercises of discretion. They are therefore undeserving of deference under <u>Firestone</u>, and a <u>de novo</u> standard of review applies"); <u>Gilbertson v. Allied Signal, Inc.</u>, 328 F.3d 625, 631 (10th Cir. 2003) (considering a claim that was deemed denied by operation of time limits in the ERISA regulations, and holding "that when substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the

district court must review the denial de novo, even if the plan administrator has discretionary authority to decide claims"); Gritzer v. CBS, Inc., 275 F.3d 291, 296 (3d Cir. 2002) ("Where a trustee fails to act or to exercise his or her discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion;"); but see S. Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993) (considering a claim that was deemed denied by operation of time limits in the ERISA regulations, and holding without explanation, "[i]n our view, the standard of review is no different whether the claim is actually denied or is deemed denied").

The Second Circuit decisions are not so clear cut.  The Second Circuit "[held] that a 'deemed denied' claim is entitled to de novo review, and place[d] [itself] in harmony with Jebian, Gilbertson, and Gritzer."  Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 109 (2d Cir. 2005).  However, it subsequently appeared to limit that holding to cases in which there was no decision to which to defer.  See Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 212 (2d Cir. 2006) ("In Nichols, the insurer's inaction 'le[ft] the court without any decision or application of expertise to which to defer.'  Here, by contrast, rather than go directly to court when the Fund failed to issue a timely initial determination, Demirovic chose to appeal.  She then waited for and received a timely decision on her appeal.  This eventual decision constitutes a final decision and exercise of the Fund's discretion, to which we must defer.  Accordingly, we will apply arbitrary and capricious review to the Fund's determination." (citations and footnotes omitted)).

The Sixth Circuit Court of Appeals has not ruled on the precise issue before the Court here.  In one pre-Firestone decision, the Court of Appeals considered a claim that was deemed denied based on a deadline set forth in ERISA regulations and

11

held that the standard of review was no different whether the appeal was denied or deemed denied.  Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988).  However, that decision did not address a situation such as the one before the Court here where the terms of the plan itself limited the Committee's discretion. In addition, the Court of Appeals has noted that Daniel articulated the prevailing pre-Firestone approach, but that post-Firestone, it is clear that "discretion is not the norm, and that, absent a grant of discretion, an administrator's decision will be reviewed de novo."  Anderson v. Great West Life Assurance Co., 942 F.2d 392, 394 (6th Cir. 1991).  A more recent Court of Appeals decision, while recognizing Daniel, wrote (without deciding) that "there is undeniable logic in the view that a plan administrator should forfeit deferential review by failing to exercise its discretion in a timely manner."  University Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 n.3 (6th Cir. 2000), cited in Jebian, 349 F.3d at 1107.  Accordingly, it may be that Supreme Court's decision in Firestone foreclosed the reasoning in Daniel.[2]  Regardless, Daniel is distinguishable from

---

[2] This is supported by the reasoning of the Tenth Circuit, which wrote:

> Firestone establishes de novo review as the default standard for reviewing ERISA claims, with deferential review only in those instances where an administrator's decision is an exercise of "a discretion vested in them by the instrument under which they act." Firestone, 489 U.S. at 111, 109 S.Ct. 948 (emphasis in original) (internal quotations omitted). Therefore, to be entitled to deferential review, not only must the administrator be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion. It follows that where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's "deemed

the instant case because it was applying a "deemed approved" provision in the regulations rather than in the plan at issue.

Here, the National City Plan itself provides that claims for severance benefits may be deemed approved if a determination is not made within certain time constraints:

> If a notice of denial is not received by a Participant within the lesser of (a) 120 days of the Committee's receipt of the claim or (b) within 30 days of the Committee's or its designee(s)'s making its determination with respect to the Participant's claim, the claim shall be deemed to have been approved.

(Docket No. 51, Exhs. 1 & 3 at ¶5.2.)  This provision, by its language, provides for automatic approval of a claim, independent of the merits of the claim, and without requiring any decision-making, discretionary or otherwise.  Accordingly, any language in the plan providing a general grant of discretion to the Committee is constrained by the specific language of section 5.2 providing for a default, non-discretionary approval of claims after certain time periods.  See, e.g., Jebian, 349 F.3d 1098, 1105-06 (9th Cir. 2003) ("where the plan itself provides that a particular procedural violation results in an automatic decision rather than one calling for the exercise of the administrator's discretion, that provision is as enforceable as the provision giving the administrator discretionary authority under other circumstances."); see also Anderson, 942 F.2d at 395 (noting that, consistent with the teachings of Firestone, an

---

> denied" decision is by operation of law rather than the exercise of discretion, and thus falls outside the Firestone exception. When the administrator fails to exercise his discretion within the required timeframe, the reviewing court must apply Firestone's default de novo standard.

Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631-32 (10th Cir. 2003).

administrator might be given "discretion with respect to some decisions but not others") cited in Shy v. Navistar International Corp., — F.3d —, 2012 WL 6216370, at *3 (6th Cir. Dec. 14, 2012). Therefore, where, as here, there is a "deemed approved" provision that operates automatically and not as a matter of discretion, the Court exercises de novo review to determine whether the claim should have been deemed approved in accordance with the plan language.

To determine whether the claims were denied within the time period proscribed by section 5.2 of the plan, the Court must first determine when the Committee received a "claim." On March 15 and 16, 2010, each of the Plaintiffs sent a letter to representatives of Defendants PNC and Red Capital Group, which, according to each letter, was intended to serve as notice of a change in circumstances and of an intent to pursue severance benefits. Those letters were received some time before March 31, 2010, because on March 31, 2010, Defendant Kerry Allen, as Plan Administrator, sent each Plaintiff a memo referring to and responding to those letters. Plaintiffs contend that those March 15 and 16 letters were claims for purposes of section 5.2.

In support of their argument, Plaintiffs point to Defendants' March 31, 2010 memo. The subject line of that memo specifically referred to the "Claims Submitted" under the various plans. In this memo, the Plan Administrator acknowledged Plaintiffs' belief that they may have severance claims and reported that PNC disagreed with Plaintiffs' belief. The memo stated, "If you believe PNC's position is incorrect, you are entitled to file a claim under those plans with the Plan Administrator and/or the relevant plan Committee." However, the memo went on to state, "The Plan Administrator and the respective plan Committee will treat your previous submission as a 'claim' under the plans you designated, unless you notify me that you

14

wish to withdraw one or more of those claims." The Plan
Administrator stated that "The Plan Administrator and the
respective plan Committee have 90 days from the date of your
claim to review it, and 30 days after making a determination to
respond to you in writing." In deciding to treat the March 15
and 16 letters as "claims," and specifically noting that the
Committee would have to respond to the claims within the time set
forth in section 5.2, the Committee waived any formal
requirements for claims that were not met and resolved to treat
the letters as properly-filed claims. Neither party contends
that Plaintiffs withdrew any claims. Accordingly, it appears
that the claims were received by the Committee before March 31,
2010.

Defendants argue that the claims should not be deemed
approved because Plaintiffs' claims were not meritorious and were
"gotcha" arguments (by which Defendants mean Plaintiffs are
seeking to exploit a technicality).[3] However, to the extent that
they are procedural or "gotcha" arguments, they are ones
permitted by the National City Plan, which provided for an
automatic procedural approval of the claims after a certain
amount of time had passed independent of the merits.
Accordingly, if Defendants failed to deny the claims within the
time allotted, "the claim[s] shall be deemed to have been
approved," regardless of whether Plaintiffs' claim would have
been approved by the Committee. (Docket No. 51, Exhs. 1 & 2 at §
5.2.) For purposes of the "deemed . . . approved" language, it
is irrelevant whether Plaintiffs would have been successful in

---

[3] Merriam Webster defines "gotcha" as "an unexpected usually
disconcerting challenge, revelation, or catch; *also*: an attempt
to embarrass, expose, or disgrace someone (as a politician) with
a gotcha." See http://www.merriam-webster.com/dictionary/gotcha.

their claims, so Defendants' argument about whether Plaintiffs
were terminated has no place in this discussion.

Defendants also argue that the March 15 and 16 letters were
not claims, but rather that the subsequently-submitted "Claim
Forms" were the "claims" for purposes of determining when the
clock began to run under section 5.2.  This is not supported by
the language of the National City Plan or by the language of the
March 31, 2010 letter.  The National City Plan provides that the
clock begins to run on the Committee's receipt "of the claim"
with a small "c" and does not define claim to mean claim form,
but merely says that a "Participant *may* make a claim for
severance benefits under this Plan by submitting a written
request to the Committee on the form supplied for this purpose."
(Docket No. 51, Exhs. 1 & 2 at § 5.1 (emphasis added).)  In the
March 31, 2010 memo, the Plan Administrator distinguishes between
small "c" claims and capital "C" "Claim Forms."  The memo
provided that the March 15 and 16 letters were to be treated as
"claims" and that the "official 'Claims Forms,'" if completed,
were for the purpose of "facilitat[ing] the claim process" and
"enabl[ing] the Plan Administrator and the respective plan
Committee to fully consider your claim based upon all of the
facts and circumstances."  The Plan Administrator explained that
the Claim Forms did not have to be completed and if they were
not, "a determination under the plans will be made based on the
information you previously submitted."  The Plan Administrator
then went on to set forth the amount of time the Committee had to
respond in writing.  The Plan Administrator did not say that the
Committee had 90 days from the date of the "Claim Form" to review
it and then 30 days to respond, but rather said that the
Committee had 90 days from the "claim," which is the same term
that the Plan Administrator applied to the March 15 and 16
letters.

16

Because the letters were treated as claims, and the letters were received by the Committee before March 31, 2010, the Committee had to send a notice of denial and Plaintiffs had to receive such notice at least by July 29, 2010 (120 days after the Committee received the claims) in order to avoid the operation of the "deemed approved" provision in the National City Plan.  There were no denials issued until August 18, 2010 at the earliest. Accordingly, as of July 29, 2010, the claims were deemed approved by whichever version of the National City Plan was in effect at that time.

The motion for partial summary judgment specifically seeks judgment on Plaintiffs' claim that their claims were deemed approved under the 2005 version of the National City Plan, so the next relevant question is whether that version of the National City Plan was in existence at the time.  In denying Plaintiffs' appeal, the Committee determined that the 2005 version of the National City Plan did not exist during the relevant time period because it had been amended by the 2008 version.  The question of whether the 2005 version of the National City Plan was effectively amended, though implicating the question of whether the claims can be deemed approved, does not fall within the relatively straightforward time calculation of Section 5.1, so there is still a question of what standard of review applies to that determination.  However, in light of the fact that either the 2005 version or the 2008 version of the National City Plan was in effect, and under either plan, the claims were deemed approved as of July 29, 2010 at the latest, the subsequent decisions by the Committee were unauthorized and are not entitled to any deference.  Accordingly, the question before the Court is whether Plaintiffs have demonstrated as a matter of law that the 2005 version of the National City Plan was in effect in 2010.

Defendants argue that the 2005 version of the National City

17

Plan was properly amended by the 2008 version, and accordingly, the 2005 version was not in effect after that date. Plaintiffs argue that the Defendants' attempt to enact the 2008 version of the National City Plan was ineffective because the amendment occurred during a "Protection Period." Article 15 of the 2005 version of the National City Plan provides that it may be amended or discontinued, but provides the following limitation: "This Plan shall not, however, be amended, modified or discontinued after the Effective Date until the later of the end of the Protection Period or such time as all claims payable hereunder have been fully discharged." (Docket No. 51, Exh. 1 at § 15.) Both parties agree that the 2005 version of the National City Plan could not have been amended during a Protection Period. The parties dispute, however, the date on which the Protection Period commenced, or in other words, which date was the Effective Date. The Effective Date is defined as follows "In the event a Change in Control ultimately results from discussions or negotiations involving the Corporation or any of its officers or directors, the 'Effective Date' of such Change in Control shall be the date uninterrupted discussions or negotiations commenced." (Id. at § 2.1(i).) The Change in Control at issue here was the December 31, 2008 acquisition of National City by PNC.

Plaintiffs argue that the "Effective Date and the resulting limitation on Defendants' ability to amend the 2005 Plan was triggered no later than September 29, 2008," the day before the September 30, 2008 amendment. (Docket No. 53 at 15.) As evidence, Plaintiffs point to a presentation made on September 29, 2008 by the investment banking firm of Goldman Sachs to National City regarding potential transaction structures and potential acquirers. (Docket No. 51, Exh. 18D.) Plaintiffs also cite to a PNC news release stating that as of October 24, 2008, PNC and National City Corporation had announced that they had

18

signed a definitive agreement for PNC to acquire National City.
(Docket 53, Exh. 19.)

    Defendants dispute that the September 29, 2008 presentation
demonstrates what Plaintiffs claim it demonstrates, and
Defendants also dispute Plaintiffs' interpretation of the plan's
definition of "Effective Date."  Defendants argue that the
Effective Date was October 3, 2008, three days after the
September 30, 2008 amendment.  (Docket No. 61 at 14.)  That date
is based on an email from a PNC employee to another PNC employee
sent on August 2, 2010 that was then forwarded to the Plan
Administrator on September 29, 2010.  That email states, "We were
first notified that another process was going to take place
regarding NCC on October 3, 2008 and we signed a confidentiality
agreement on October 5, 2008 to enter the process."  (Docket No.
51, Exh. 36.)  Defendants also point out that the September 29,
2008 presentation refers to "potential strategic partners" and
was a part of a presentation involving several alternative plans,
only one of which involved selling the company.  (Docket No. 61
at 16.)

    The plan language at issue is the following:

    "<u>Effective Date</u>".  In the event a Change in Control
    ultimately results from discussions or negotiations
    involving the Corporation or any of its officers or
    directors, the "Effective Date" of such Change in
    Control shall be the date uninterrupted discussions or
    negotiations commenced.

(Docket No. 51, Exh. 1 at § 2.1(i).)  Plaintiff argues that this
language should be interpreted to include discussions with the
investment banking firm of Goldman Sachs, even if the eventual
acquisition partner, PNC, was not a party to these discussions.
Even if the Court accepts Plaintiffs' interpretation of the plan,
Plaintiffs have failed to demonstrate that any discussions
between National City and Goldman Sachs that occurred on

19

September 29, 2008 ultimately resulted in the Change in Control.
Viewing the presentation in the light most favorable to the non-
moving party, the reference to potential sale partners including
PNC does not conclusively demonstrate that there were discussions
(much less ongoing discussions) between National City and Goldman
Sachs as to the potential sale to PNC as early as September 29,
2008, nor is there evidence that Goldman Sachs acted as an agent
for the sale so that any discussions between Goldman Sachs and
National City could result in a sale to PNC.  These things may,
in fact, be true, but the current record does not establish them
to be so.

While Plaintiffs mention in their briefs that they believe
they are entitled to discovery on this issue and others, their
motion for such discovery was filed separately and will be
addressed separately.  Of course, in the absence of any facts
which such discovery might produce, the Court cannot grant
Plaintiffs' summary judgment to the extent that such facts are
necessary in order to decide the summary judgment motion.

Accordingly, because the Court is unable to determine as a
matter of law that the 2008 amendment was ineffective, Plaintiffs
have failed to demonstrate at this time that their claim should
be deemed approved pursuant to the 2005 version of the National
City Plan.  The Court recommends that Plaintiffs' motion for
partial summary judgment be denied as to Count VII.

**B.  Whether the Second Set of Claims Should Be Deemed
    Approved Under the Red Capital Plan**

Plaintiffs have also asserted claims in this litigation
pursuant to the Red Capital Group Management Severance Plan ("Red
Capital Plan").  Like the National City Plan, the Red Capital
Plan provided severance benefits to certain Red Capital
executives upon a "Change in Control." (Docket No. 51, Exh. 3 at
§§ 1.2 & 2.1(d).)  Also like the National City Plan, the Red

20

Capital Plan provides that claims for severance benefits may be deemed approved if a determination is not made within certain time constraints:

> If a notice of denial is not received by a Participant within the lesser of (a) 120 days of the Plan Administrator's receipt of the claim or (b) within 30 days of the Plan Administrator's or its designee(s)'s making its determination with respect to the Participant's claim, the claim shall be deemed to have been approved.

(Id. at ¶5.2.)  This provision, by its language, provides for automatic approval of a claim, independent of the merits of the claim, and without the exercise of any decision-making, discretionary or otherwise.  As discussed in the previous section, where, as here, there is a "deemed approved" provision that operates automatically and not as a matter of discretion, the Court exercises de novo review to determine whether the claim should have been deemed approved in accordance with the plan language.

The parties do not dispute that Plaintiff Russi submitted a claim on June 16, 2010 and that Plaintiff Jones submitted a claim on June 24, 2010.  Further, Defendants do not dispute Plaintiffs' argument that Defendants failed to respond to those claims within the time proscribed in the Red Capital Plan.  However, Defendants contend that the claims cannot be deemed approved because the Red Capital Plan was rescinded on April 16, 2010.

Plaintiffs Jones and Russi argue that Defendants, by responding to the other Plaintiffs' claims under the Red Capital Plan, have essentially admitted the plan's continued viability or, at least, Defendants' obligation to respond.  Plaintiffs have cited no legal authority for this argument, and the Court is not aware of any legal authority that supports this position. Defendants' act of responding to other Plaintiffs' claims cannot create a contractual duty if none existed.

21

Plaintiffs also argue that the fact that Defendants directed Plaintiffs to file claims in accordance with the claims process estopped Defendants from claiming they had no obligation to respond to Plaintiffs' claims. Equitable estoppel may be asserted in ERISA cases. <u>Bloemker v. Laborers' Local 265 Pension Fund</u>, 605 F.3d 436, 440 (6th Cir. 2010) (recognizing that equitable estoppel is a viable theory in ERISA cases involving welfare plans and extending that to pension cases "where the representation was made in writing and where the plaintiff can demonstrate extraordinary circumstances"). However, the elements of equitable estoppel must be met. Those elements are the following:

> (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

<u>Spraque v. Gen. Motors Corp.</u>, 133 F.3d 388, 403 (6th Cir. 1998) (citation omitted). Plaintiffs have made no attempt to satisfy those elements, and in particular have not demonstrated that they justifiably relied upon the Defendants' instructions to their detriment.

Lastly, Plaintiffs argue that Defendants' attempt to rescind the Red Capital Plan was ineffective. Like the National City Plan, the Red Capital Plan could be amended or discontinued, but it could not be amended or discontinued "after the Effective Date until the later of the end of the Protection Period or such time as all claims payable hereunder have been fully discharged." (Docket No. 51, Exh. 3 at § 15.) Plaintiffs argue that Defendants' attempt to rescind the Red Capital Plan on April 16,

2010 occurred during a Protection Period leading up to ORIX's acquisition of some of Red Capital's assets in May 2010. Defendants argue that there was no Protection Period because the May 2010 acquisition did not constitute a Change in Control under the plan terms.  Plaintiffs have failed to demonstrate that there is no issue of material fact on this issue or that the Court can determine, as a matter of law, that a Change in Control occurred as defined in the Red Capital Plan.  Absent that showing, the Court cannot conclude for purposes of this motion for partial summary judgment that the April 16, 2010 discontinuation of the plan occurred during a Protection Period and was invalid.

### IV.  Conclusion

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the Motion for Partial Summary Judgment (Docket No. 53) be **DENIED**.

Defendants requested oral argument to the extent that oral argument would assist the Court in analyzing the record.  The Court does not find that oral argument would assist the Court in analyzing the record and accordingly does not recommend oral argument.

### V.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the

magistrate judge with instructions.  28 U.S.C. §636(b)(1).
The parties are specifically advised that failure to object to
the Report and Recommendation will result in a waiver of the
right to have the district judge review the Report and
Recommendation *de novo*, and also operates as a waiver of the
right to appeal,  the decision of the District Court adopting the
Report and Recommendation. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140
(1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).
The parties are further advised that, if they intend to file an
appeal of any adverse decision, they may submit arguments in any
objections filed, regarding whether a certificate of
appealability should issue.

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge