IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Craig S. Jones, et al.,

    Plaintiffs,

v.                                Case No. 2:11-cv-380

Kerry A. Allen, Plan              JUDGE MICHAEL H. WATSON
Administrator, et al.,            Magistrate Judge Kemp

    Defendants.

<u>REPORT AND RECOMMENDATION</u>

    Plaintiffs are five individuals who were employed by Red Mortgage Capital, Inc., Red Capital Markets, Inc., Red Capital Advisors, LLC, or Red Capital Community Development Company, LLC, (collectively "Red Capital").  On May 3, 2011, Plaintiffs filed this action against Red Capital, certain severance plans, a plan administrator, and a company that acquired Red Capital, alleging that those Defendants wrongly denied them benefits and otherwise infringed on their rights under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq*, and their contractual rights.  The motion before the Court here is Defendants' Motion for Judgment on the Administrative Record (Docket No. 60), in which Defendants moved for an entry of judgment on the administrative record, seeking judgment in their favor on all claims except the retaliation claim in Count II.  This motion has been fully briefed and referred to the Magistrate Judge for a Report and Recommendation.

    For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Defendants' Motion for Judgment on the Administrative Record (Docket No. 60) be granted in part and denied in part as follows: granted as to Counts I, III, IV, V, VI, VII, VIII, IX, X, and XIII of the Complaint, and denied without prejudice as to Counts

XI and XII of the Complaint.

## I. Facts

The following background facts are undisputed.  Red Capital engages in mortgage and investment banking activities.  In 2004, National City Corporation ("National City") acquired Red Capital. On December 31, 2008, Defendant the PNC Financial Services Group, Inc. ("PNC") acquired National City, and assumed responsibility for the administration of certain benefit plans.  In May of 2010, certain of the business operations and assets of Red Capital were acquired by an investment group led by ORIX USA Corp. ("ORIX"). Plaintiffs were all senior executives at Red Capital from at least 2003 until some point in 2010.  Plaintiffs sought severance benefits from Defendants, and Defendants denied their requests and appeals.  Plaintiffs filed this action asserting that they were entitled to severance benefits pursuant to several plans or agreements and that Defendants' denial of benefits, among other actions, violated ERISA.

### A.  Severance Benefits Plans and Agreements

The first of the severance benefits plans at issue is the National City Corporation Amended and Restated Management Severance Plan ("National City Plan").  This plan covered certain executives of National City and its subsidiaries, including Red Capital, and it provided for the award of severance benefits if National City incurred a "Change in Control."  (Docket No. 51, Exhs. 1 & 2 at §§ 1.2 & 2.1(d).)  One version of the National City Plan was effective January 1, 2005.  On September 30, 2008, there was an amendment to the National City Plan.  In its August 16, 2013 Opinion and Order, the Court upheld the Committee's determination that the 2008 Amendment to the National City Plan was valid.  (Docket No. 125 at 20-23.)

Article 3 of the National City Plan provides that Participants will be entitled to benefits in certain situations

in which a Participant's employment terminates during a "Protection Period" following a "Change in Control" of National City:

> 3.1 In the event the Surviving Entity terminates the Participant's employment during the Protection Period, the Participant will be entitled to the severance compensation provided by Article 4; . . .
>
> 3.2  The Participant may terminate employment with the Surviving Entity during the Protection Period with the right to severance benefits as provided in Article 4 upon the occurrence of one or more of the following events (regardless of whether any other reason for such termination exists or has occurred, including without limitation other employment):
>
> (a)  A reduction in the Participant's Base Salary; or The Surviving Entity of the Participant requires the Participant to have his principal location of work changed, to any location which is excess of 50 miles from the location thereof immediately prior to the Change in Control.

(Docket No. 51, Exh. 2 (2008 version of National City Plan).) The 2005 version of the National City Plan included additional circumstances in which a participant could terminate employment and still be eligible for benefits, but the 2008 amendments eliminated those provisions.

Plaintiffs have also asserted claims in this litigation pursuant to the Red Capital Group Management Severance Plan ("Red Capital Plan").  The Red Capital Plan provided severance benefits to certain Red Capital executives upon a "Change in Control." (Docket No. 51, Exh. 3 at §§ 1.2 & 2.1(d).)  The Red Capital Plan defined "Change in Control" as "the sale of all or a substantial amount of the assets and liabilities of RED by Corporation to a non-affiliate.  For purposes of this Plan substantial amount shall mean a [sic] least 90% of RED's assets and liabilities. . . ."  (Id. at § 2.1(d).)  Following a Change in Control, there would be a "Protection Period" beginning on the "Effective Date," which was defined as follows: "In the event a Change in Control

3

ultimately results from discussions or negotiations involving
RED, the 'Effective Date' of such Change in Control shall be the
date uninterrupted discussions or negotiations commenced." (Id.
at §2.1(i) & (s).)  The Protection Period continued "through to
the fifteenth month anniversary of the Implementation Date."
(Id. at §2.1(m) & (s).)  The plan provided that the plan could
not be "amended, modified or discontinued" during the Protection
Period.  (Id. at §15.)

Article 3 of the Red Capital Plan provides for certain
situations in which termination of a Participant's employment
during a Protection Period entitled a Participant to benefits:

> 3.1 In the event the Surviving Entity terminates
> the Participant's employment during the Protection
> Period, the Participant will be entitled to the
> severance compensation provided by Article 4; . . .
> 3.2  The Participant may terminate employment with
> the Surviving Entity during the Protection Period with
> the right to severance benefits as provided in Article
> 4 upon the occurrence of one or more of the following
> events (regardless of whether any other reason for such
> termination exists or has occurred, including without
> limitation other employment):
> (a) A significant adverse change in the nature or
> scope of the authority, powers, functions,
> responsibilities or duties attached to the position
> with the Surviving Entity that the Participant held
> immediately prior to the Effective Date;
> (b) A change in compensation reasonably likely to
> yield a reduction in the aggregate of the participant's
> Base Salary and incentive pay received from the
> Surviving Entity;
> (c) A reduction in the Participant's Base Salary;
> . . .
> (e) A determination by the Participant (which
> determination will be conclusive and binding upon the
> parties hereto provided it has been made in good faith
> and in all events will be presumed to have been made in
> good faith unless otherwise shown by the Corporation by
> clear and convincing evidence) that a change in
> circumstances has occurred following a Change in
> Control, including, without limitation, a change in the
> scope of the business or other activities for which the

> Participant was responsible immediately prior to the
> Change in Control, which has rendered the Participant
> substantially unable to carry out, has substantially
> hindered Participant's performance of, or has caused
> Participant to suffer a substantial reduction in, any
> of the authorities, powers, functions, responsibilities
> or duties attached to the position held by the
> Participant immediately prior to the Effective Date,
> which situation is not remedied within 10 calendar days
> after written notice to the Surviving Entity from the
> Participant of such determination;
>         . . .

(Docket No. 51, Exh. 3 at §§ 3.1 & 3.2.)

The Red Capital Plan provides that it is to be administered
by the Plan Administrator and grants "full power and authority to
interpret, construe and administer this Plan and its
interpretations and construction hereof," and provides that
actions made by the Committee in accordance with the plan shall
be "binding and conclusive on all persons for all purposes."
(Id. at §14.)  The Red Capital Plan also provides that claims for
severance benefits may be deemed approved if a determination is
not made within the following time constraints:

> If a notice of denial is not received by a Participant
> within the lesser of (a) 120 days of the Plan
> Administrator's receipt of the claim or (b) within 30
> days of the Plan Administrator's or its designee(s)'s
> making its determination with respect to the
> Participant's claim, the claim shall be deemed to have
> been approved.

(Id. at § 5.2.)

In addition to the National City Plan and the Red Capital
Plan, Plaintiffs have also alleged that there was an unwritten
severance agreement.  In briefing the motion for judgment on the
administrative record, both parties have referred to this alleged

5

agreement as the "2006 Severance Guaranty," although Defendants contest its existence or continued existence.  The evidence in the administrative record that one or both parties has pointed to as relevant to understanding the facts surrounding the 2006 Severance Guaranty is the following:

- On April 14, 2006, John Adams (the Chairman and CEO of Red Capital Advisors, LLC) sent Steve Cummings (a senior executive for National City) a draft severance plan, which was to "put a temporary change of control agreement in place to protect our folks [Red Capital employees] given that it is taking a while for National City to put its revised plan in place."  The key issues that the temporary agreement was to cover were to ensure that Red Capital employees who should be covered by the existing National City Plan might "be at risk due to erroneous categorization" and to ensure that a small group of about 10 Red Captial Employees was to get "2 times coverage." (Docket No. 51, Exh. 28, Attachment K.)

- On July 10, 2006, John Adams sent Steve Cummings another email explaining, among other items, that he recognized that National City would be redrafting its severance plan soon, that National City and Red Capital had agreed to certain terms but had not documented the agreement because they had expected to do so by amending the Plan, and that "the understanding described herein will be more fully and completely documented when the Plan is redrafted."  The email also noted the same concern as in the April email about certain Red Capital employees being without protection, and this email attached a list of employees who "shall be entitled to Severance Compensation" whether or not they were technically coded correctly, and a list of employees entitled to twice the amount that would otherwise be paid pursuant to the terms of the Plan.  Finally, this email noted that "[t]he definition of 'Change in Control' shall be interpreted to also include a change in control of Red, including the sale of all or substantially all assets owned by Red." (Docket No. 51, Exh. 28, Attachment M.)

- The next day Steve Cummings replied that he would share the list of employees with others and would look into some of the employee grades. He further wrote, "[t]he goal is to redraft all of the National City Management Severance Plans as soon as 'final' 409(A) regulations are available."  On July 27, 2006, John Adams asked if he could tell the employees identified as ones who should receive benefits

that they are covered, and the next day Steve Cummings replied that if John Adams were to let those individuals know, he should "make sure [to] convey the intent and that the plan will be developed this fall pending 409(A) final regulations. . . ." (Docket No. 51, Exh. 28, Attachment N.)

- On September 22, 2006, Plaintiff Steven Russi emailed Jeff Tengel and copied others regarding the Change of Control Protection. He wrote that he was providing "additional background and information regarding the change in control protections we briefly discussed earlier this week." He wrote, "[w]e have long been in agreement with Steve Cummings and Phil Rice regarding the proper approach for extending National City's Management Severance Plan to Red employees. At this point, our goal is to confirm that the individuals we have identified in the attached schedule are entitled to receive compensation under the Management Severance Plan at the rate of either one or two times the relevant compensation amounts, as those amounts are calculated in the Plan. Further, we want to be sure that any sale of Red would also trigger our rights under the Plan given that any transaction of that nature would perhaps pose greater uncertainty for Red employees than would the sale of National City as a whole." Mr. Russi also wrote that the previous emails were ambiguous about whether the protections would only kick in once the amendments had been made and that he wanted confirmation that the employees were protected since the amendments were taking such a long time. (Docket No. 51, Exh. 28, Attachment O.)

- On September 25, 2006, Steve Cummings emailed Jeff Tengel and copied others regarding the change in control discussion. He wrote that "we verbally agreed to provide change in control protection for several key business leaders at Red Capital in lieu of employment agreements. Our goal was to provide change-in-control protection while eliminating the need for complex employment agreements and the 'single' trigger change in control arrangement that was part of the operating agreement at Provident. Our recommendation was to provide change in control protection consistent [sic] the National City Management Severance Plan with respect to structure, 'double' triggering events, and protection period. Our thinking at the time is that the group would consist of a subset of Red's Executive Committee and the protection would be worth 2x base and bonus for this group. . . . Due to regulation changes . . . we have not been in a position to finalize the Red Capital Change-in-Control provisions nor update the National City Management Severance Plan versions." He wrote that the agreement would

7

be finalized when all the versions of the National City Management Severance Plan could be updated, and he reaffirmed their commitment to honor this agreement in the interim. On September 28, 2006, Jeff Tengel forwarded that email to William Roberts and wrote, "[w]e are precluded from executing a side agreement . . . . In the interim, John Couture has provided verbal assurances that we will honor the spirit of the agreement absent documentation." Docket No. 51, Exh. 28, Attachment P.)

Plaintiffs have brought claims pursuant to this 2006 Severance Guaranty in addition to claims pursuant to the written Severance Plans.

### B. Events Surrounding Plaintiffs' Claims

There is no dispute that PNC's December 31, 2008 acquisition of National City constituted a "Change in Control" as defined by the National City Plan, which triggered a Protection Period that "'ran until March 31, 2010.'" (Docket No. 60 at 6 (citing Compl. at ¶ 175).)

By February and March of 2010, PNC was in active discussions about selling Red Capital. On March 15 and 16, 2010, each of the Plaintiffs sent a letter to representatives of Defendants PNC and Red Capital Group, which, according to the letters, were intended to serve as notice of a change in circumstances and of an intent to pursue severance benefits. The Purchaser "interpreted [these letters] as precursors to litigation against PNC or Red Capital or both." (Docket No. 37, Exh. 1 at ¶3.) Mr. Russi averred that on March 17, 2010, the Purchaser extended "offers of continuing employment" to all of Red Capital's management employees except for Mr. Russi, the other four Plaintiffs in this case, and one other employee who had given notice the day before of their intent to assert their rights under the Plans. Defendants do not dispute this and have offered an affidavit describing the offers of continued employment as follows:

[Following the receipt of the March 16, 2010 letters,] the investor group authorized the distribution to all

8

personnel whom the investors hoped to employ a document entitled "Offer of Continued Employment," with a release incorporated therein, or "Confirmation of Employment," with a release agreement attached.  These documents were intended to allow us to identify those employees who wanted to remain with the post-closing entity and who, in order to do so, were willing to release any claims they might have or thought they had against PNC, ORIX, Red Capital, or any of their affiliates.  These releases were not limited to claims under severance plans, but rather applied to all employment-related claims.

(Docket No. 37, Exh. 1 at ¶4.)

On March 30 and 31 of 2010, Plaintiffs notified Defendants of their conditional resignations.[1]  (Docket 51, Exhs. 10-14.)

On March 31, 2010, the last day of the National City Plan Protection Period, Defendant Kerry Allen, as Plan Administrator, sent each Plaintiff a memo acknowledging Plaintiffs' belief that they may have severance claims, reporting that PNC disagreed with Plaintiffs' belief and stating, "PNC further contends that, if you resign your employment, you will not be entitled to and will not be paid any severance or displacement benefits." (Docket No. 51, Exh. 9.)  The March 31, 2010 memo also encouraged the Plaintiffs to submit their claims on Official Claim Forms, which Plaintiffs did in April. (Docket No. 51, Exhs. 15-29.)  The claims on the Official Claim Forms that sought benefits arising from the change in control when PNC acquired National City, shall be referred to as the "First Set of Claims."

On April 16, 2010, PNC issued a notice that it was discontinuing and terminating the Red Capital Plan. (Docket No. 51, Exh. 37.)

---

[1] The parties do not dispute that Plaintiffs continued to come to work after the "conditional" resignations, and Plaintiffs knew that PNC believed those "conditional" resignations to be ineffective.

In May of 2010, certain of the business operations and assets of Red Capital were acquired by an investment group led by ORIX USA Corp. ("ORIX"). On May 25, 2010, Plaintiff Russi emailed John Johnson, Chief Legal Counsel for Employment at PNC, telling Mr. Johnson that he believed severance benefits should have been paid to him under the Red Capital Plan based on the sale of certain assets of Red Capital to ORIX. (Pls.' Mot. Summ. J., Exh. 15.) Mr. Johnson replied to that email on May 26, 2010, stating that "it is PNC's position that you are not eligible for benefits under the RED Capital Group Management Severance Plan (Effective July 1, 2008). If you believe an additional claim needs to be filed, I believe you know the process by which you may do so." (Id.) Plaintiff Russi replied the same day requesting information about the structure of the transaction selling assets of Red Capital to ORIX, and then emailed again the following day stating that he assumed PNC did not intend to provide him factual information regarding the sale or the basis for denying severance benefits, but rather required him to file a claim and await the Plan Administrator's decision. (Id.) Mr. Johnson replied to those emails on June 3, 2010 and explained that, among other reasons, PNC believed Plaintiff Russi was not eligible for benefits under the Red Capital Plan because (1) there was no Change in Control as defined by the Red Capital Plan, (2) Plaintiff Russi had not been terminated as of the date he filed his first claim, and (3) on the date of Plaintiff Russi's termination from employment, the Red Capital Plan was no longer in existence. (Pls.' Mot. Summ. J., Exh. 16.) He ends his email by writing, "If you believe you have a valid claim under the plan that you have not already filed, however, I encourage you to follow the process established by the plan to resolve disputes thereunder. If you need new [sic] claim form, you can obtain one from Kerry Allen." (Id.)

On June 16 and 24 of 2010 respectively, Plaintiffs Russi and Jones initiated a second set of claims (the "Second Set of Claims") for severance benefits under the Red Capital Plan.  This time, the claims were based on the sale of certain business operations and assets of Red Capital Group to ORIX.  (Docket No. 51, Exhs. 33 & 30.)

On August 18, 2010, the Plan Administrator notified each Plaintiff that the Committee had denied the First Set of Claims.  (Docket No. 51, Exhs. 38-42.)[2]  On September 15 and October 14, Defendants denied Mr. Martin and Mr. Zeigler's Second Set of Claims.  (Docket No. 51, Exhs. 44 & 47.)

On October 14, 2010, Plaintiffs filed notices appealing the Plan Administrator's August 18, 2010 decision denying their First Set of Claims.  (Docket No. 51, Exhs. A-E; Docket No. 59, Exh. T.)  On November 8, 2010, Plaintiffs Martin and Ziegler filed notices appealing the Plan Administrator's denial of their Second Set of Claims.  (Docket No. 51, Exhs. G & J; Docket No. 59, Exh. T.)

On December 7, 2010, Plaintiffs Russi and Jones, having received no response to their Second Set of Claims, notified Defendants of their belief that Defendants' failure to respond within 120 days caused those claims to be deemed approved pursuant to section 5.2 of the Red Capital Plan.  (Docket No. 51, Exh. 48.)  On December 17, 2010, Defendants responded, and denied the Second Set of Claims of Jones, Poling, and Russi, explaining that Defendants did not believe those claims were good faith claims that required a response.  (Docket No. 51, Exhs. 43, 45 & 46.)  The reasons given for not treating the claims as good faith

---

[2] While the denials to each Plaintiff are not identical, they are substantially the same.  Unless the language at issue differs from claim to claim, the Court will provide the page citation for the denial addressed to Mr. Jones (Docket No. 51, Exh. 38).

claims were the following: (1) Defendants contended that the Red Capital Plan ceased to exist as of April 16, 2010, and (2) Defendants contended that Plaintiffs Russi and Jones had not severed their employment with PNC at the time the claim forms were submitted. (Id.) Defendants also explained additional reasons why they believed the claims to be without merit. (Id.)

Also on December 17, 2010, the Second-Level Claim and Appeal Committee denied Plaintiffs' Notice of Appeal of the First Set of Claims. (Docket No. 51, Exhs. K-O.)

On February 11, 2011, Plaintiffs Jones, Poling, and Russi appealed the denial of their Second Set of Claims. (Docket No. 51, Exhs. F, H & I.)

On April 8, 2011, the Second-Level Claim and Appeal Committee denied Plaintiffs' Jones, Poling, and Russi's appeal of the Second Set of Claims. (Docket No. 51, Exhs. P-R.)

## II. Relevant Procedural History

The Court will not set forth the entire procedural history here, but only describe some of the motions that will be referred to in this Report and Recommendation.

On August 24, 2012, Plaintiffs filed a motion for partial summary judgment on Counts VII and XI (Docket No. 53). Plaintiffs argued that pursuant to the terms of the Plans, Plaintiffs' claims were "deemed approved" based on the failure of Defendants to issue a decision within the time provided by the Plans. Plaintiffs also argued that the Court ought to conclude as a matter of law that the 2005 version of the National City Plan is the controlling plan and remains in full force and effect. On November 5, 2012, the Court referred the motion for partial summary judgment to the Magistrate Judge for issuance of a report and recommendation (Docket No. 70). On February 7, 2013, the Magistrate Judge issued a Report and Recommendation recommending that the motion for partial summary judgment be

12

denied (Docket No. 84).  Plaintiffs and Defendants filed
objections to the Report and Recommendations (Docket Nos. 91, 93,
94).  On August 16, 2013, the Court sustained Defendants'
objections and employed different reasoning for denying
Plaintiffs' motion for partial summary judgment than that
recommended by the Magistrate Judge (Docket No. 125).  As a
result of the Court's reasoning, the Court denied the Plaintiffs'
objections as moot.  (Id.)

In ruling on the motion for partial summary judgment, the
Court made determinations relevant to the pending motion for
judgment on the administrative record.  Those rulings will be
discussed in the analysis section below.

On September 27, 2012, Defendants moved for an entry of
judgment on the administrative record, seeking judgment in their
favor on all claims except the retaliation claim in Count II
(Docket No. 60).  This motion, which is the motion before the
Court here, has been referred to the Magistrate Judge for a
Report and Recommendation (Docket No. 131).

In Plaintiffs' response to this motion, they also moved to
compel discovery and supplement the record.  This Court ruled on
the motion to compel discovery and supplement the record,
granting it in part and denying it in part.  Plaintiffs have
objected to that order, the parties have briefed the objections,
and the Court has not ruled on those objections at this time.
Defendants have also filed motions for protective orders that are
currently pending.

Defendants have also filed a "Motion for Leave to File
Instanter a Supplemental Brief in Support of Defendants' Motion
for Judgment on the Administrative Record" (Docket No. 126) and a
Motion for Joinder in that brief (Docket No. 128).  Plaintiffs
responded that they do not oppose leave to file such a brief or
join such a brief, although they reserve the right to file

responses to the supplemental briefs (Docket No. 130).  The
proposed brief address the claims brought pursuant to the Red
Capital Plan.

### III. Standard

As a general rule, "a denial of benefits challenged under §
1132(a)(1)(B) is to be reviewed under a de novo standard unless
the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan." Firestone Tire & Rubber Co.
v. Bruch, 489 U.S. 101, 115 (1989).  When a plan gives the
administrator or fiduciary discretionary authority to "construe
and interpret the plan . . . a court reviews the administrator's
decision on the eligibility of benefits under the 'arbitrary and
capricious' standard." Daft v. Advest, Inc., 658 F.3d 583,
594-95 (6th Cir. 2011).  Because the determination of whether
review should be de novo or under the arbitrary and capricious
standard depends on the terms of the plan at issue, there will be
a separate discussion of the standard of review for each plan.

Defendants briefed the issue of whether the plans are "top
hat plans" under ERISA, arguing that the plans are not "top hat
plans" and even if they were, that arbitrary and capricious
review would apply.  In response, Plaintiffs state by way of
footnote that they "assume arguendo that the deferential standard
of review applies and proceed to address certain issues on the
merits," while they reserve their right to argue in later briefs
that de novo review applies.  (Docket No. 72 at 19.)
Accordingly, Plaintiffs have not demonstrated that any of the
plans at issue are top hat plans, and for purposes of this motion
the Court will assume that the plans are not top hat plans.

Under either "arbitrary and capricious" review or de novo
review, "a court's review of a plan administrator's decision . .
. is confined to the evidence in the administrative record."

14

Daft v. Advest, Inc., 658 F.3d 583, 594-95 (6th Cir. 2011)
(citations omitted). A court's review of a procedural challenge
to the administrator's decision, as opposed to the substance of
the administrator's decision, may consider evidence not presented
to the plan administrator:

> The district court may consider evidence outside of the
> administrative record only if that evidence is offered
> in support of a procedural challenge to the
> administrator's decision, such as an alleged lack of
> due process afforded by the administrator or alleged
> bias on its part. This also means that any prehearing
> discovery at the district court level should be limited
> to such procedural challenges

Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 430 (6th Cir.
2006) (quoting Wilkins v. Baptist Healthcare System, Inc., 150
F.3d 609, 619 (6th Cir. 1998)). A motion to compel is pending,
and the resolution of that motion may be relevant to certain
challenges to the administrative procedure, but there are several
issues on the merits that are appropriate for resolution now.

## IV. Analysis

Defendants seek an entry of judgment in their favor on all
claims based on the Administrative Record except for Count II
(the retaliation claim). In their briefs, the parties organize
their argument by the plans or alleged plans at issue rather than
going through the counts in the complaint in numerical order, and
this Report and Recommendation will do the same.

### A. Claims Relating to the National City Plan

The first issue, which relates to Counts VII, VIII, IX, X,
and XIII of the Complaint, is whether Plaintiffs are entitled to
any benefits under the National City Plan.

### 1. Standard of Review under the National City Plan

The Court's August 16, 2013 Opinion and Order considered the
language of the National City Plan in light of the claims and
facts, and the Court determined that standard of review for the

National City Plan was a heightened form of review for arbitrary and capricious error.  (See Docket No. 125 at 10-19 (citations omitted).)

Under an "arbitrary and capricious" standard of review, the Court will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006) (internal quotations and citations omitted) aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).  However, the review "does not require us merely to rubber stamp the administrator's decision." Glenn, 461 F.3d at 666 (internal quotations and citations omitted).  Rather, courts are required to review the "evidence and the opinions on both sides of the issues." Id. at 666 (internal quotations and citations omitted).

As the Court's August 16, 2013 Opinion and Order noted, because the same entity funds the plan and makes benefits determinations, a heightened form of arbitrary and capricious review applies. See, e.g., Curry v. Eaton Corp., 400 F. App'x 51, 58 (6th Cir. 2010) ("Notwithstanding the deference afforded a plan administrator under arbitrary-and-capricious review, courts must evaluate potential conflicts of interest and consider them as factors in determining whether the decision to deny benefits was arbitrary and capricious. . . .  In such cases, the arbitrary-and-capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest.") (citations omitted).

## 2.  Analysis of National City Plan Claims

The first of the National City Plan Claims, Count VII, sought a determination that the Committee failed to respond to claims under §5.2 of the National City Plan within the time permitted and that under the terms of the National City Plan the

claims were deemed approved. The Court already considered Count VII in its August 16, 2013 Opinion and Order and denied Plaintiffs' motion for judgment on that count. While the motion before the Court in that Opinion and Order was styled as a motion for partial summary judgment, the Court construed Plaintiffs' motion as one for judgment on the administrative record. Based on the administrative record, the Court determined that the Committee's determination that Plaintiffs' March and April 2010 submissions were not "claims" and, therefore, were not subject to § 5.2's "deemed approved" provision was a reasoned determination and the Court would not disturb it. Accordingly, judgment is appropriate in Defendants' favor and against Plaintiffs as to Count VII of the Complaint.

The remaining Counts claiming benefits pursuant to the National City Plan allege that Plaintiffs are entitled to benefits on the merits because the Plan provides that participants are entitled to benefits if certain circumstances occur following a change in control. Plaintiffs sought benefits under both the 2005 and 2008 versions of the National City Plan. The Committee denied all claims for benefits under either version of the National City Plan.

In its denial of Plaintiffs' claims for benefits pursuant to the 2005 version of the National City Plan, the Committee determined that "the 2005 National City Plan ceased to exist in September 2008. . . . any claims for benefits to which you believe that you are entitled are properly brought only under the terms of the 2008 National City Plan." (Docket No. 51, Exh. 38 at 4.) In its August 16, 2013 Opinion and Order, the Court, while not determining whether or not it would approve of the Committee's determination that the 2005 National City Plan ceased to exist, did decide that the Committee's determination that the 2008 Amendment to the National City Plan was valid was a reasoned

determination.  Accordingly, all claims will be analyzed pursuant to the language of the 2008 National City Plan.  (Docket No. 125 at 23.)

Counts VIII, IX, and X rely on language that was in the 2005 version of the National City Plan but that was eliminated in the 2008 version of that Plan.  The Court has determined that the Committee's decision that the 2008 amendment to the National City Plan was effective was a reasoned decision (Docket No. 125 at 23), and accordingly, judgment is appropriate in Defendants' favor and against Plaintiffs as to Counts VIII, IX, and X.

Count XIII of the Complaint relies on a provision of the National City Plan that was <u>not</u> eliminated by the 2008 amendment. In Count XIII Plaintiffs allege that they were entitled to benefits pursuant to § 3.1 of the Plan because they were "effectively terminated from employment March 17, 2010 when Red Capital, at the direction of the Investor Group, notified them that they were not considered for continued employment with the Investor Group following the closing of the Red-Orix Transaction." (Docket No. 2 at ¶ 381.)  Because the Protection Period arising from PNC's acquisition of National City extended until March 31, 2010, if Plaintiffs were terminated on March 17, 2010, they would be entitled to severance compensation.  However, if they were terminated after March 31, 2010, they would not be entitled to severance compensation.

The Committee specifically considered Plaintiffs' argument that "the terms of the 2008 National City Plan entitle [Plaintiffs] to benefits because [they] experienced a reduction in [their] base salary coupled with incentive pay, leading to [their] constructive discharge during the 'protection period.'" (Docket No. 51, Exh. 38 at 2.)  The Committee did not discuss the concept of constructive discharge, but rather concluded: "our records indicate, and you do not dispute, that you were

terminated from employment effective as of the close of business on June 26, 2010." (Docket No. 51, Exh. 38 at 3.) Plaintiffs appealed this decision, arguing again for constructive termination, specifically arguing that by extending offers of employment to employees who did not give the Committee notice of an intent to claim severance benefits, Defendants effectively notified Plaintiffs of their termination from active employment by virtue of their lack of an employment offer. (Docket No. 51, Exhs. A-E.) In their denial of Plaintiffs' appeal, the Committee reasoned as follows:

> The Committee took note of the text of Section 3.1 of the 2008 National City Plan upon which you assert your claim for benefits on behalf of Mr. Ziegler. Section 3.1 of the 2008 National City Plan concerns eligibility for benefits only upon an involuntary termination of employment (other than for cause or upon death or disability) during the "Protection Period." The Committee determined that Section 3.1 of the 2008 National City Plan does not provide benefits upon anything less than an actual separation from service. Accordingly, the Committee concluded that your claim for benefits on behalf of [Participant] on account of his having been "effectively terminated" on March 17, 2010 does not entitle him to benefits under Section 3.1 of the 2008 National City Plan. Moreover, PNC's records reflect, and you have not disputed, that his involuntary termination from employment – that is, his actual separation from service - occurred as of the close of business on June 26, 2010. Because this date occurred nearly three months after the end of the 2008 National City Plan's "Protection Period," no severance benefits are due to him under its terms.

(Docket No. 51, Exhs. K-O at 9 (footnote omitted).)

The Committee's decision was not based upon disputed facts, but rather an interpretation of the National City Plan and whether Section 3.1 allowed benefits in instances of constructive termination or, as the Committee concluded, whether the National City Plan "does not provide benefits upon anything less than an actual separation from service." Because there is no dispute

that the actual separation from service occurred after the
Protection Period, the only question is whether the Committee's
interpretation of Section 3.1 as requiring actual separation from
service satisfies the heightened form of review for arbitrary and
capricious error that applies here.

Section 3.1 entitles a Participant to benefits "[i]n the
event the Surviving Entity terminates the Participant's
employment during the Protection Period" unless certain
exceptions apply.  This language does not, on its face, include
constructive termination.  In addition, section 3.2 specifies the
only circumstances under which a Participant may terminate
employment with the right to severance benefits.  Read together,
it is reasonable to interpret those provisions as setting forth
the only instances when something other than actual termination
by the employer entitles a Participant to benefits.  See Caldwell
v. PNC Fin. Servs. Grp., Inc., 835 F. Supp. 2d 510, 522-23 (S.D.
Ohio 2011) (interpreting the same National City Plan and the same
provisions of the Plan and determining that the Appeal
Committee's interpretation of the Plan language as excluding
constructive termination was "the only reasonable interpretation
as a matter of law"); see also Marks v. Newcourt Credit Grp.,
Inc., 342 F.3d 444, 459 (6th Cir. 2003) (deciding that
administrators' decision that the plan required actual
termination or resignation rather than constructive termination
was not arbitrary and capricious).[3]  Accordingly, the Committee's

_____

[3] The Court of Appeals in Marks also noted that there was a
specific showing required to demonstrate constructive discharge
that had not been met in that case:

At any rate, Marks could not demonstrate that he was
constructively discharged: "In order to demonstrate
constructive discharge, an employee must show that
working conditions were so unpleasant and unreasonable
that a reasonable person in the employee's shoes would

interpretation of Section 3.1 as requiring actual, not constructive, termination is rational and reasonable in light of the Plan provisions.  Accordingly, judgment is appropriate in Defendants' favor and against Plaintiffs as to Count XIII.

**B.  Claims Relating to the Red Capital Plan**

The second issue, which relates to Counts XI and XII of the Complaint, is whether Plaintiffs are entitled to any benefits under the Red Capital Plan.

**1. Standard of Review under the Red Capital Plan**

The Court's August 16, 2013 Opinion and Order also considered the language of the Red Capital Plan in light of the claims and facts.  The Court noted that the Red Capital Plan contains "the same grant of discretion in Article 14 as the National City Plan except it grants the Plan administrator, not the Committee, the authority to determine claims and construe the terms of the plan."  (Docket No. 125 at 10-19 (citations omitted).)  However, the Court undertook a de novo review of "the threshold question of whether the Red Capital Plan was terminated."  (Docket No. 125 at 27.)  The de novo standard of review applies to factual conclusions of plan administrators unless the plan explicitly vests fact-finding discretion in the plan administrator.  Rowan v. Unum Life Ins. Co. of America, 119 F.3d 433, 436 (6th Cir. 1997).  "This de novo standard of review

---

have felt compelled to resign." Welsch v. Empire Plastics, Inc., No. 99-3420, 215 F.3d 1328, 2000 WL 687678, **4 (6th Cir. May 19, 2000) (citing Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991)). Marks neither claims that he felt compelled to resign before October 1, 1998, nor alleges that his working conditions were unpleasant.

Marks, 342 F.3d at 459.  Likewise, Plaintiffs here have not demonstrated that conditions satisfied that definition of "constructive discharge."

applies to the factual determinations as well as to the legal conclusions of the plan administrator." <u>Wilkins v. Baptist Healthcare Sys., Inc.</u>, 150 F.3d 609, 613 (6th Cir. 1998) (citing <u>Rowan</u>, 119 F.3d at 435); JAMES F. JORDEN ET AL., HANDBOOK ON ERISA LITIGATION §201(A) (3d ed. 2007) ("[W]hen the factual circumstances are undisputed, the existence of an ERISA plan is a question of law to be reviewed de novo.").

## 2. Analysis of Red Capital Plan Claims

Count XI alleges that Plaintiffs Russi and Jones' Second Set of Claims, which were based on the alleged Change in Control resulting from the ORIX transaction, were deemed approved pursuant to section 5.2 of the Red Plan. (Docket No. 2 at ¶361.) However, those claims were submitted after PNC issued a notice of termination of the Red Capital Plan effective April 16, 2010. (Docket No. 51, Exh. 37.)

Count XII alleges that the Red-Orix Transaction constituted a Change in Control for purposes of the Red Plan, and that Plaintiffs' Separation from Service on April 30, 2010 occurred during the Protection Period arising from that Change in Control. (Docket No. 2 at ¶¶ 369, 371 & 372.)  That count alleges that Plaintiffs are entitled to benefits under Section 3.1 of the Red Plan as a result of the separation during the alleged Protection Period and that, accordingly, Defendants unlawfully denied benefits. (Docket No. 2 at ¶¶369-74.)

Because Counts XI and XII both involve the ORIX Transaction, the claims at issue in both Counts are the Second Set of Claims, which were filed in June of 2010. (The First Set of Claims addressed only the alleged Change in Control based on PNC's acquisition of National City.)

The Committee denied Plaintiffs' Second Set of Claims. (Docket No. 51, Exhs. 43-47.)  In denying those claims, the Committee based its denial, in part, on the April 16, 2010

discontinuance and termination of the Red Capital Plan, which Plaintiffs argue was an invalid termination.  The Committee determined that, because the Plan ceased to exist as of April 16, 2010, the Committee had no obligation to respond to the claims filed after that date.  Accordingly, a threshold question is whether the April 16, 2010 discontinuance and termination of the Red Capital Plan was valid.

In its August 16, 2013 Opinion and Order, the Court considered whether the termination of the Red Plan was valid or whether it occurred during a Protection Period as defined by the Red Plan.  (Docket No. 125 at 27-19.)  The Court determined that it did not have enough information to determine whether PNC properly terminated the Red Capital Plan on April 16, 2010.  The Court further declined to remand to the Committee until after the motion for discovery and motions for judgment on the administrative record had been considered.  As the District Court has not ruled on the objections to the Order granting in part and denying in part the motion for discovery, and as there are two motions for protective orders still pending, the Court recommends denying the motion for judgement on the administrative record as to Counts XI and XII without prejudice to refile a motion on that issue after the resolution of the discovery objections and motions.

### C.  Claims Relating to the 2006 Severance Guaranty

The third issue, which relates to Counts I, III, IV, V, and VI of the Complaint, is whether Plaintiffs are entitled to any benefits under the 2006 Severance Guaranty.

### 1.  Standard of Review under the 2006 Severance Guaranty

The continued existence of the 2006 Severance Guaranty is disputed, and that question must be resolved as a mixed question of fact and law.  The de novo standard of review applies to factual conclusions of plan administrators unless the plan

explicitly vests fact-finding discretion in the plan administrator.  Rowan v. Unum Life Ins. Co. of America, 119 F.3d 433, 436 (6th Cir. 1997).  "This de novo standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 613 (6th Cir. 1998) (citing Rowan, 119 F.3d at 435); JAMES F. JORDEN ET AL., HANDBOOK ON ERISA LITIGATION §201(A) (3d ed. 2007) ("[W]hen the factual circumstances are undisputed, the existence of an ERISA plan is a question of law to be reviewed de novo.").  Accordingly, the Court will examine de novo the question of whether there was a 2006 Severance Guaranty.

If the 2006 Severance Guaranty exists, the Court must determine whether there is evidence of any delegation of authority for administering and interpreting the unwritten 2006 Severance Guaranty in order to determine whether the abuse of discretion or de novo standard applies.  See, e.g., 2 ERISA Practice and Litigation § 11:53 ("In some benefit claim disputes, the absence of a written plan document, insufficient plan language, or defects in the claim procedure, may result in de novo judicial review of a benefit denial.") The only evidence that either party cites to suggest that the unwritten 2006 Severance Guaranty intended to delegate authority to the Plan Administrator is the language of the subsequently adopted Red Capital Plan.[4]  However, the Court is not persuaded that the

_____

    [4] Ironically, the party that has pointed to this evidence is the Plaintiffs, and they have pointed to this evidence for other purposes.  Plaintiffs have asserted claims under the 2006 Severance Guaranty based upon language in the Red Capital Plan. In their Complaint, Plaintiffs write in a footnote: "Because National City failed to adopt a written plan with the agreed terms of the 2006 Severance Guaranty, Plaintiffs' references to specific sections of the 2006 Severance Guaranty are to the Red Plan as modified to reflect the agreed terms of the 2006

language adopted approximately two years later, some of which
Plaintiffs claim contradicted the parties' intent, can be relied
on as credible evidence of a delegation of authority.  The
parties have pointed to no other evidence in the administrative
record demonstrating such a delegation of authority, and
accordingly, in the absence of such clear delegation it appears
that <u>de novo</u> review would be the appropriate standard for
interpreting the terms of the 2006 Severance Guaranty.

## 2. Existence of 2006 Severance Guaranty

The email exchanges set forth in the fact section of this
Report and Recommendation demonstrate that National City and Red
Capital did agree upon an unwritten policy regarding the
provision of change-in-control benefits to certain Red Capital
Employees.  Defendants' primary argument to the contrary seems to
be that the policy was never "adopted," but the emails expressly
acknowledge a policy to provide for Red Capital employees in the
event of a change in control.

The parties do not dispute that, if such a policy existed,
it would qualify as an ERISA plan.  (<u>See</u> Docket No. 60 at 30-31.)
Whether a policy qualifies as an ERISA plan is a question of fact
"to be answered in light of all the surrounding circumstances and
facts from the point of view of a reasonable person."  <u>Kolkowski</u>

---

Severance Guaranty." (Docket No. 2 at n.3.)  As a result,
Plaintiffs' claims pursuant to the 2006 Severance Guaranty adopt
language from Sections 3.2 and 5.2 of the Red Capital Plan as
well as the definition of the Protection Period.  (Docket No. 2
at, <u>e.g.</u>, ¶¶ 83, 86, 111.)  Accordingly, Plaintiffs take the
position that the Red Capital Plan essentially set forth the
terms of the 2006 Severance Guaranty except for the terms that
contradicted that Guaranty.  If Plaintiffs' position were
accepted, the question before the Court would be whether the Red
Capital Plan language at Article 14, which provided the Plan
Administrator discretion in interpreting and administering the
Plan, correctly codified the understanding of the 2006 Severance
Guaranty or whether that was contradictory to that Guaranty.

v. Goodrich Corp., 448 F.3d 843, 847 (6th Cir. 2006) (citations
omitted).  A severance plan such as this one may be an employee
benefit welfare plan as long as "it requires 'an ongoing
administrative program to meet the employer's obligation.'"
Kolkowski, 448 F.3d at 848-49 (6th Cir. 2006) (citations
omitted).  In particular, the Court of Appeals "has used two
particular factors to determine . . . if ERISA governs: 1)
whether the employer has discretion over the distribution of
benefits, and 2) whether there are on-going demands on an
employer's assets." Id.  "[I]f to determine benefits the
employer must analyze each employee's particular circumstances in
light of the appropriate criteria, the severance plan is probably
an ERISA plan." Id. (citations omitted).  Here the 2006
Severance Guaranty would only permit benefits in the event of a
change in control, which included the sale of all or
substantially all assets owned by Red Capital, which itself
involved a determination by the Committee.  Accordingly, the
discussion below treats the 2006 Severance Guaranty as an ERISA
plan.

### 3.  Continued Existence of 2006 Severance Guaranty

The next question is the continued existence of the 2006
Severance Guaranty.  Plaintiffs raised claims pursuant to the
2006 Severance Guaranty in their First Set of Claims.  Defendants
denied those claims, concluding that the parties all intended
that the 2006 Severance Guaranty (if one existed) would redraft
or update the then-existing National City Plan and that in
accordance with that intent, the National City Plan was amended
twice and the Red Capital Plan was executed in 2008.  (Docket No.
51, Exhs. 38-42.)  Defendants then concluded, "[e]ven assuming
that the Committee could have concluded that an Interim Plan [the
2006 Severance Guaranty] existed at some prior point in time, the
terms of any such Interim Plan would have been superseded by one

or more of these later-executed Plans." (<u>Id</u>.)  This
interpretation of the 2006 Severance Guaranty and impact of the
amendments of the National City Plan and adoption of the Red
Capital Plan are reviewed here <u>de novo</u>.

The existence of a 2006 Severance Guaranty would not
preclude its amendment or even termination, because employers and
plan sponsors are "generally free under ERISA, for any reason at
any time, to adopt, modify, or terminate welfare plans" or
pension benefit plans.  <u>Coomer v. Bethesda Hosp., Inc.</u>, 370 F.3d
499, 508-09 (6th Cir. 2004) (quoting <u>Curtiss-Wright Corp. v.
Schoonejongen</u>, 514 U.S. 73, 78 (1995)).  In fact, the 2006
Severance Guaranty specifically contemplated that it would be
amended or replaced by written plans.  All of the email exchanges
in the Administrative Record acknowledge the interim nature of
the Guaranty, while acknowledging that the goal would be to
incorporate the protections of the 2006 Severance Guaranty into
the amendments to the National City Plan.  (<u>See</u> Docket No. 51,
Exh. 28, Attachments K ("temporary change of control agreement .
. . to protect our folks given that it is taking a while for
National City to put its revised plan in place"); M ("the
understanding described herein will be more fully and completely
documented when the Plan is redrafted"); N ("make sure [to]
convey the intent and that the plan will be developed this fall
pending 409(A) final regulations. . . ."); P ("In the interim,
John Couture has provided verbal assurances that we will honor
the spirit of the agreement absent documentation")).
Furthermore, neither party has argued that Plaintiffs had a
vested right to benefits under the 2006 Severance Guaranty.

Understanding that the 2006 Severance Guaranty contemplated
that it would be replaced or amended by written documents, and
that it could be replaced or amended by written documents, the
next question is whether one or both of the written plans did so.

In their briefing, Defendants argue that the language of the National City Plan disclaims the existence of any unwritten plans.  This argument was not a part of the Committee's denial of the First Set of Claims, but it was a part of the Committee's explanation of its denial of the appeal of the First Set of Claims.  Defendants argue that section 1.3 of the National City Plan provided that it was the only plan under which a claimant could seek benefits for a change in control of National City. That argument is inconsistent with the language of section 1.3, which does not say anything about being the only Plan, but rather states that the severance compensation provided "shall be the sole severance compensation a Participant will be entitled to from the Surviving Entity as a result of Change in Control."  As Plaintiffs have pointed out, that language directly speaks to the possibility of "double dipping" rather than renouncing all other plans.  However, the absence of an integration clause or a merger clause does not necessarily mean that the 2006 Severance Guaranty continued to exist after the amendment to the National City Plan and the creation of the Red Capital Plan.

The key elements of the 2006 Severance Guaranty that appeared in the emails in the Administrative Record were providing change-in-control benefits to certain Red Capital employees who would not otherwise be covered by the National City Plan, providing double compensation for select employees, and ensuring that Change in Control was defined to include the sale of all or substantially all assets owned by Red.  The first appears to have been resolved either through the amendments to the National City Plan or through the administrative categorization of the employees, because both parties agree that Plaintiffs are covered by the current National City Plan, as well as the Red Capital Plan.  In addition, the Red Capital Plan was written specifically to cover the employees set forth on Exhibit

A to that Plan, which was nearly identical to the list of employees that the 2006 Severance Guaranty was intended to protect. (Docket No. 51, Exh. 3 at §2.1(o) & Exh. A thereto.) The parties have not addressed whether the National City Plan and Red Capital Plans provide double compensation for certain individuals, but those plans certainly define the level of compensation that would be awarded to participants who were entitled to severance compensation. The final key element of the 2006 Severance Guaranty was addressed in the Red Capital Plan, which provides that a Change in Control "means the sale of all or a substantial amount of the assets and liabilities of RED by Corporation to a non-affiliate. . . ." (Docket 51, Exh. 3 §2.1(d).) Accordingly, given that the Red Capital Plan and the amended National City Plan cover the subject matter included in the 2006 Severance Guaranty, it is apparent that the Red Capital Plan and the amendments to the National City Plan were an attempt to codify or amend the 2006 Severance Guaranty.

When a written policy attempts to codify an oral one, it would be incorrect to give "more value to the informal oral policy than to the more recent written" Plan. Gordon v. Barnes Pumps, Inc., 999 F.2d 133, 137 (6th Cir. 1993). Furthermore, "[i]t is well-established that the written terms of a plan may not be modified or superseded by oral assurances or other extrinsic evidence." Gordon, 999 F.2d at 137; see also Nester v. Allegiance Healthcare Corp., 162 F. Supp. 2d 901, 908 (S.D. Ohio 2001) (holding that the "formal written plan trumps any prior representations that [Defendant] may have made to the Plaintiffs regarding their entitlement to transition benefits"). Accordingly, even if the Red Capital Plan contradicts the terms of the 2006 Severance Guaranty, the written Red Capital Plan controls. The 2006 Severance Guaranty no longer exists because it has been amended or superceded by the Red Capital Plan.

29

Plaintiffs' breach of contract claim pursuant to the 2006 Severance Guaranty also fails, because it is pre-empted by ERISA. See, e.g., Gordon, 999 F.2d at 137; Nester, 162 F. Supp. 2d at 903-04.  Plaintiffs have made no arguments to the contrary.

Accordingly, Plaintiffs cannot prevail on any of their claims under the 2006 Severance Guaranty, and judgment is appropriate in Defendants' favor and against Plaintiffs as to Counts I, III, IV, V, and VI.

## V.  Conclusion

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the Motion for Judgment on the Administrative Record (Docket No. 60) be granted in part and denied in part as follows: granted as to Counts I, III, IV, V, VI, VII, VIII, IX, X, and XIII of the Complaint, and denied without prejudice as to Counts XI and XII of the Complaint.

## VI.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the

right to appeal,  the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge